**V. A. DAVIS et al.,**
**Plaintiffs-Appellees,**

**v.**

**M/V ESTER S, her engines, boilers, tackle, etc., and the BARGE AUNT MAME, Defendants,**

**Steuart Transportation Company, Movant-Appellant.**

**No. 74–1933.**

United States Court of Appeals, Fifth Circuit.

March 24, 1975.

Rehearing and Rehearing En Banc

Denied April 30, 1975.

---

**10.** Appellant's Brief, 55–56.

James F. Moseley, Jacksonville, Fla., W. B. Ewers, John A. Prokop, Jr., Washington, D. C., for movant-appellant.

W. O. Birchfield, Jacksonville, Fla., James N. Jacobi, Washington, D. C., for plaintiffs-appellees.

Jack C. Rinard, Tampa, Fla., for other interested parties.

Before THORNBERRY, COLEMAN and ROSENN,* Circuit Judges.

ROSENN, Circuit Judge:

This appeal presents issues of interest to maritime navigation in the delicate waters of federal-state relations. Florida requires that certain vessels, upon entering or leaving her ports, take on state-licensed pilots, for whose services a fee is charged.[1] In order to discourage noncompliance, Florida holds vessels liable for the fee whether or not pilots actually are utilized. We must determine whether, insofar as the Florida pilotage statute applies to nonself-propelled barges carrying inflammable or combustible liquid cargo in bulk, it is preempted by federal legislation.

The St. Johns Bar Pilot Association (Pilot Association) instituted this in rem admiralty action to recover a fee of $156.00 for pilot services which were offered to but refused by the tug ESTER "S" and her tow, the barge "AUNT MAME." The Pilot Association served

---

* Of the Third Circuit, sitting by designation.

1. The Florida pilotage statute provides in pertinent part:

All steamers or vessels entering any port or leaving the same shall be subject to pay to any licensed pilot performing duty on board, or to the pilot who shall first speak to such steamer or vessel, the following rates of pilotage: . . . . These minimum rates shall apply to all steamers or vessels whether owned wholly by citizens of this state or not, except that all steamers or vessel drawing less than six feet of water and having a coastwise license shall be exempt from paying pilotage unless they employ a pilot.

12 Fla.Stat.Ann. § 310.11(Supp. 1974).

The vessel involved in this appeal had a mean draft of approximately 18 feet 9 inches.

process only on the "AUNT MAME," which was claimed by Steuart Transportation Company (Steuart).[2] The United States District Court for the Middle District of Florida heard the case as on cross-motions for summary judgment. In connection with their motions, the parties submitted exhibits and a stipulation of facts, the relevant portions of which we shall summarize.

The "AUNT MAME," towed by the ESTER "S," left Philadelphia, Pennsylvania, bound for Jacksonville, Florida. Although the crew members of the "AUNT MAME" were federally licensed, none held a valid federal or state pilot's license for the Port of Jacksonville. When the barge and tug reached the mouth of the St. Johns River, the Pilot Association offered to provide a state-licensed pilot for the inbound passage to the Port of Jacksonville. The pilot's services were refused.

The "AUNT MAME" is a federally enrolled and inspected tank barge, specially constructed to transport liquid bulk cargo. At the time of its voyage to Jacksonville, the "AUNT MAME" was transporting asphalt, an inflammable or combustible liquid cargo in bulk.

The district court held that the "AUNT MAME" was not a "coastwise seagoing steam vessel" on which federal pilots are required and that, since federal law did not require a pilot, Florida's pilotage statute is not preempted as applied to the "AUNT MAME" and similar vessels. We reverse.

### I.

■ The Pilot Association acknowledges that the constitutional grant of power to the federal government to regulate commerce with foreign nations and among states includes the power to regulate pilotage. U.S.Const. art. I, § 8. It contends, however, that at the time the Constitution was adopted the maritime states regulated pilotage and that Congress in 1789 plainly indicated that state regulation was to continue until

Congress specifically provided otherwise. Act of Aug. 7, 1789, ch. 9, § 4, 1 Stat. 54, 46 U.S.C. § 211 (1970). The Pilot Association asserts that Congress has not withdrawn from the states regulatory power over pilotage of nonself-propelled vessels. We disagree.

Congress has required that "coastwise seagoing steam vessels," with certain exceptions not here relevant, be manned by federally licensed pilots in coastal waters.

> [E]very coastwise sea going steam vessel subject to the navigation laws of the United States, and to the rules and regulations aforesaid, not sailing under register, shall, when under way, except on the high seas, be under the control and direction of pilots licensed by the Coast Guard.

46 U.S.C. § 364 (1970), *formerly* 52 R.S. § 4401; *see* Olsen v. Smith, 195 U.S. 332, 343, 25 S.Ct. 52, 49 L.Ed. 224 (1904); Spraigue v. Thompson, 118 U.S. 90, 96, 6 S.Ct. 988, 30 L.Ed. 115 (1886). Thus, the threshold question is whether the "AUNT MAME" is a "coastwise seagoing[3] steam vessel" for purposes of section 364.

■ Congress broadened the definition of a "steam vessel" as that term was employed in title 52 of the Revised Statutes to include barges transporting certain hazardous cargoes.

> Sec. 4417a. (1) All vessels, regardless of tonnage, size, or manner of propulsion, and whether self-propelled or not, and whether carrying freight or passengers for hire or not, that shall have on board any inflammable or combustible liquid cargo in bulk, except public vessels owned by the United States, other than those engaged in commercial service, shall be considered steam vessels for the purposes of this title [52] and shall be subject to the provisions thereof . . . . .

Act of June 23, 1936, ch. 729, 49 Stat. 1889, 52 R.S. § 4417a, as amended, 46 U.S.C. § 391a(1) (1970). Because on this

---

**2.** Steuart and the Pilot Association stipulated that the ESTER "S" was not served and is not a party to this action.

**3.** Neither party attaches significance to the word "seagoing" in the context of this case.

voyage to Jacksonville the "AUNT MAME" was transporting asphalt, an inflammable or combustible liquid cargo in bulk, the district court concluded, as do we, that the "AUNT MAME" was a "steam vessel." The district court went on to hold, however, that, even though Congress expressly expanded the definition of "steam vessel" "for purposes of this title [52]," it intended the broadened definition to apply only to the inspection provisions of title 52 and not to provisions of the same title governing operation and manning, including piloting, of such vessels. We disagree.

We are persuaded that Congress, in enacting section 391a, was concerned with the operation and manning of steam vessels as well as with their inspection. One year earlier, during the first session of the Seventy-fourth Congress, similar legislation was passed which proved inadequate to achieve the objectives intended by its drafters. Act of Aug. 26, 1935, ch. 697, 49 Stat. 868. This legislation, Public 343, as it was known, was intended to "bring about a reasonable and uniform set of rules and regulations concerning . . . operation and manning" of vessels transporting hazardous cargoes. H.R.Rep. No. 2962, 74th Cong., 2d Sess., at 2 (1936). The Solicitor of the Department of Commerce[4] ruled, however, that under Public 343

> no rules and regulations could be made regarding manning or the operation or movement of the vessel, its cargo, or any of its equipment. Inasmuch as these items constituted a great part of the hazard against which protection was needed, it was deemed best to secure this legislation [section 391a].

*Id.* Congress thereupon authorized the Department of Commerce to promulgate regulations "with respect to the operation of such vessels; and with respect to the requirements of the manning of such vessels and the duties and qualifications of the officers and crews thereof

. . . ." Act of June 23, 1936, ch. 729, 49 Stat. 1889, as amended, 46 U.S.C. § 391a(2) (1970). In so doing, we believe it evinced an overall intent to legislate beyond the sphere of inspection.

Section 391a(1) expressly provides a broadened definition of "steam vessel" "for purposes of this title [52]." This language plainly extends the expanded definition to all of title 52, including present section 364 requiring federally-licensed pilots. The Pilot Association has not brought to our attention, nor have we found, legislative history which, in the face of section 391a(1)'s unequivocal language, would justify a more restrictive interpretation. We therefore conclude that the "AUNT MAME" was a "steam vessel" for purposes of section 364. Since the "AUNT MAME" is enrolled as a "coastwise" vessel, we hold that it was a "coastwise seagoing[5] steam vessel" on which a federally-licensed pilot is required.

## II.

The question remains whether Congress, in requiring that "coastwise seagoing steam vessels" be under the "control and direction" of federally-licensed pilots, intended to exempt such vessels from state pilotage laws.

Congress has provided substantial guidance in this regard.

> No State or municipal government shall impose upon pilots of steam vessels any obligation to procure a State or other license in addition to that issued by the United States, or any other regulation which will impede such pilots in the performance of the duties required by title 52 of the Revised Statutes; nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by title 52 of the Revised Statutes; and in no case shall the fees charged for the pilotage of any steam vessel exceed the customary or legally established rates in the State where the same is

---

**4.** The Department of Commerce, through the Bureau of Marine Inspection and Navigation, administered the federal inspection and pilotage statutes at the time section 391a was enacted. Act of May 27, 1936, ch. 463, 49

Stat. 1380. The Bureau's functions were transferred to the Coast Guard in 1946. 1946 Reorg.Plan No. 3, § 101, 60 Stat. 1097.

**5.** *See* note 3 *supra.*

performed. Nothing in title 52 of the Revised Statutes shall be construed to annul or affect any regulation established by the laws of any State, requiring vessels entering or leaving a port in any such State, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such State, or of a State situate upon the waters of such State.

46 U.S.C. § 215 (1970), *formerly* Act of Feb. 28, 1871, ch. 100, § 51, 16 Stat. 455. We believe section 215 precludes enforcement of Florida's pilotage statute with respect to "coastwise steam vessels" such as the "AUNT MAME."[6]

 We are aware that the "AUNT MAME," in violation of section 364, did not have a federally-licensed pilot on board. However, we do not interpret the proscription against levying a fee against "any steamer piloted as provided by title 52" as exempting from state pilotage laws only those vessels actually piloted in compliance with section 364. The last sentence of section 215, at least by implication, precludes state regulation of pilotage insofar as coastwise steam vessels are concerned. Only state pilotage regulations concerning "other than coastwise steam vessels" are not to be annulled or affected. Moreover, if a state could require a state-licensed pilot on coastwise steam vessels not piloted in accordance with federal law, the state in effect would be arrogating unto itself the role of enforcing the federal pilotage requirement. We are unwilling to ascribe to Congress such an intent. Congress has entrusted the Coast Guard[7] with authority to license pilots[8] and enforce section 364. *See* 46 U.S.C. § 224 (1970). Congress also has provided penalties for noncompliance with section 364. *See id.* We therefore conclude that state involvement in overseeing compliance with section 364 would conflict with the regulatory and enforcement scheme created by Congress.

The judgment of the district court will be reversed and the case remanded with directions to dismiss the complaint.

---

6. The Pilot Association's reliance on Askew v. American Waterways Operators, Inc. is misplaced. 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). That case concerned the federal Water Quality Improvement Act which imposes liability on shipowners and terminal facilities for cleanup costs incurred by the federal government as a result of oil spills. *See* 33 U.S.C. § 1161 et seq. (1970). Congress there provided for cooperation with the states and specifically reserved to the states the power to create causes of action to compensate parties other than the federal government. Thus the Supreme Court held that a state law which rendered shipowners and terminal facilities liable for damages incurred by the state or private persons did not conflict with federal law.

7. *See* note 4 *supra.*

8. The Coast Guard has promulgated regulations governing the examination and licensing of pilots. 46 C.F.R. § 10.05–42 to –43 (1974).